ROBERT D'AMOUR vs. BOARD OF REGISTRATION IN
DENTISTRY.

Suffolk. December 4, 1990. - March 19, 1991.

Present: LIACOS, C.J., WILKINS, ABRAMS, & O'CONNOR, JJ.

*Dentist. Board of Registration in Dentistry. Due Process of Law*, Admin-
istrative hearing, Adjudicatory proceeding. *Administrative Law*,
Agency, Proceedings before agency, Substantial evidence. *Evidence*,
Administrative proceeding.

At a disciplinary hearing before the Board of Registration in Dentistry, no
right of the dentist to due process was violated by the action of the
board's chairman, who was not a hearing officer and who did not par-
ticipate in the board's deliberations, in asking a certain expert to testify
at the hearing [579-580], or making a statement during the proceedings
[580-581].

The record of a disciplinary hearing before the Board of Registration in
Dentistry supported the board's conclusions that the dentist violated
G. L. c. 112, § 61, when he failed to observe, document and discuss a
patient's cancerous oral lesion and inserted dentures after observing the
lesion [581-582], and when he did not adequately inform a minor pa-
tient and her parents what they could reasonably expect from the treat-
ment he proposed [582-583].

The record of a disciplinary proceeding before the Board of Registration in
Dentistry did not support the board's conclusion that the dentist en-
gaged in gross misconduct in violation of G. L. c. 112, § 61, by taking
nude photographs of a patient, where there was not sufficient evidence
for a determination that the photographs lacked a scientific or profes-
sional basis. [583-584]

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on November 13, 1989.

The case was heard by *Lynch*, J.

*Thomas A. Kenefick, II* (*Barbara J. Sweeney* with him)
for the plaintiff.

*Maureen Brodoff*, Assistant Attorney General, for the Board of Registration in Dentistry.

LIACOS, C.J. On October 18, 1989, the Board of Registration in Dentistry (board) suspended Robert D'Amour's license to practice dentistry in the Commonwealth for three years, to be followed by a probationary period of three years. The board found that D'Amour: (1) committed malpractice in failing to observe, document, and discuss a cancerous lesion inside the mouth of a seventy-nine year old patient, and in inserting dentures after observing the lesion; (2) failed adequately to inform a minor patient and her parents what they could reasonably expect from an unorthodox treatment; (3) engaged in irregular billing practices; and (4) committed gross misconduct in photographing a nude patient without a scientific or professional basis for doing so.[1]

On November 13, 1989, D'Amour appealed to a single justice of this court. G. L. c. 112, § 64 (1988 ed.). On June 27, 1990, the single justice vacated the part of the order involving the irregular billing practices.[2] He affirmed the rest of the board's decision. On appeal to this court, D'Amour claims that: (1) the board deprived him of due process by failing to provide an impartial hearing; and (2) the board's order was unsupported by substantial evidence. So much of the board's order as involved the taking of nude photographs of a patient is to be vacated. We affirm the judgment of the single justice in all other respects.[3]

---

[1] The board imposed the following sanctions: as to the first violation, a six-month suspension of D'Amour's license to practice dentistry; as to the second violation, a reprimand; as to the third violation, a three-year period of probation; as to the fourth violation, a three-year suspension of license, to run concurrently with the six-month suspension.

[2] The single justice held that D'Amour did not receive adequate notice of this charge because, while the board found that his irregular billing practices violated G. L. c. 112, § 52E (1988 ed.), the order to show cause charged him with violating G. L. c. 112, § 61 (1988 ed). The sanction imposed by the part of the order vacated by the single justice was the three-year probationary period scheduled to commence at the end of the suspension period. The board does not appeal this ruling.

[3] "Although this matter comes to us in the form of an 'appeal' from the decisions of the single justice, we review the decision of the board di-

1. *Facts.* Before us are the findings by the board against D'Amour which involve three different patients. We proceed to discuss the evidence submitted at the hearing.

a. *JC.* On April 17, 1986, JC, a seventy-nine year old man, visited his physician, Dr. Frederick Schwendenmann, complaining of a sore throat. A throat culture was performed and the result was negative. On May 2, 1986, JC visited D'Amour for the first time, and requested a new set of lower dentures. After an initial examination, D'Amour concluded that JC could not be fitted for dentures at that time because JC's gums were swollen. D'Amour wrote in his treatment notes that JC's mouth and throat were irritated, and that JC was under a physician's care for the throat condition. JC visited D'Amour three more times during the next three weeks. The dentures were inserted on May 21, 1986.

On May 19, 1986, JC visited Dr. Schwendenmann, who noticed that there was a ragged lesion across the soft palate and into the right tonsillar fossa of JC's mouth. Dr. Schwendenmann referred JC to Dr. George Charkoudian, an oral surgeon. On May 22, 1986, JC visited Dr. Charkoudian, who performed a biopsy and found the lesion to be cancerous. At the hearing, Dr. Charkoudian testified as an expert in oral maxillofacial surgery. He stated that D'Amour was negligent in failing to recognize the cancer, and in inserting the dentures without first referring JC to an oral surgeon. According to Dr. Charkoudian, the dentures inserted by D'Amour came in contact with a section of the cancerous lesion.

D'Amour testified that on May 21, 1986, the day on which the dentures were installed, he recognized the lesion as being cancerous, and that he asked JC whether he was being treated by a physician for the lesion. According to D'Amour, JC told him that he was being treated for the condition. Dr. Charles White, an expert in oncology who reviewed JC's medical records, testified that D'Amour met the standard of

rectly." *Cherubino* v. *Board of Registration of Chiropractors*, 403 Mass. 350, 352 n.4 (1988). See G. L. c. 30A, § 14 (7) (1988 ed.).

care when he made sure that a physician was treating JC for the lesion. Dr. White also stated that the dentures did not come in contact with the cancerous lesion, and that the insertion of the dentures did not have an impact on the cancer.

The board concluded that D'Amour's testimony that he noticed the cancerous lesion was not credible since it was not corroborated by his treatment notes. The board also found that, assuming D'Amour did observe the lesion in JC's throat, the insertion of the dentures "was conduct which fell below good and accepted dental practice standards and constituted malpractice in the practice of dentistry, in violation of G. L. c. 112, § 61 (1988 ed.)."[4] The board suspended D'Amour's license for six months to run concurrently with a three-year suspension imposed for another violation, see note 1, *supra*, and ordered him to complete a course in oral diagnosis.

b. *BP*. In March, 1986, BP, a fourteen year old female, was referred to D'Amour by Dr. Randall Schaetzke, a chiropractor. Dr. Schaetzke had examined BP and concluded that she had scoliosis, a curvature of the spine. On March 24, 1986, during BP's first visit to D'Amour's office, he performed a temporomandibular joint (TMJ) dysfunction screening test. According to DP, BP's mother, D'Amour told her that BP had TMJ dysfunction, and that BP's jaw disorder was affecting the muscles in her back. DP testified that D'Amour told her that he would be able to treat BP's scoliosis by placing an equilibrium appliance in BP's mouth. According to DP, D'Amour stated that he was going "to move [BP's] spine." Dr. Schaetzke testified that, after D'Amour

---

[4]General Laws c. 112, § 61, states in part that "[e]xcept as otherwise provided by law, each board of registration or examination in the division of registration of the department of civil service and registration, after a hearing, may, by a majority vote of the whole board, suspend, revoke or cancel any certificate, registration, license or authority issued by it, if it appears to said board that the holder of such certificate, registration, license or authority, is incapacitated by reason of mental illness, or is guilty of deceit, malpractice, gross misconduct in the practice of his profession, or of any offense against the laws of the commonwealth relating thereto."

began treating BP, D'Amour told him that BP's "spine was moving."

Dr. John Emans, an orthopedic surgeon who began treating BP in March, 1987, after BP stopped seeing D'Amour, stated in a deposition admitted in evidence that there were no appreciable changes in BP's scoliosis between January, 1986, and March, 1987. Dr. Emans also stated that there was no scientific proof that "scoliosis of the lumbar spine is altered by treatment to the temporomandibular joint." Dr. David Keith, an oral surgeon, testified that there were "differences of opinion" regarding the relationship between the treatment for TMJ disorder and scoliosis.

D'Amour testified; he denied that he told DP or BP that he would treat BP's scoliosis. D'Amour contended at the hearing that he told DP there was a possibility the TMJ treatment would have a salutary effect on BP's scoliosis. D'Amour also denied telling Dr. Schaetzke that he had succeeded in moving BP's spine.

D'Amour called two dentists to testify about the relationship between TMJ dysfunction and scoliosis. Dr. Roger Kourey testified that, when TMJ disorder is eliminated, "it also seems to help straighten out some of the advanced curvatures of the spine." Dr. Gerald Smith testified that he believed there was a "direct connection between malocclusions and spinal posture." Dr. Smith also stated that this was a "pioneering" field of dentistry, and "that future healing teams are going to see chiropractic dental people in the mainstream treating scoliosis."

The board found that D'Amour "misled BP and her parents as to the results they could reasonably expect from the treatments and inappropriately blurred the boundaries between the dental treatment rendered by [D'Amour] and the chiropractic treatment provided by Dr. Schaetzke." The board also found that D'Amour's "statements and treatment modalities created DP's reasonable belief that [D'Amour's] treatments were directed to and, in fact, had resulted in, the straightening of BP's spine." The board concluded that "[a]lthough [D'Amour's] behavior in this matter does not

support a finding that he violated [G. L. c. 112, § 61] by committing malpractice in his treatment of BP, [D'Amour] failed to adequately and properly advise BP and her parents as to the 'pioneering' nature of his prescribed treatment and the results which could reasonably be expected to be obtained therefrom." As a result, the board reprimanded D'Amour.

c. *LC.* On October 9, 1984, LC, a thirty-one year old woman, visited D'Amour complaining of pain in her face and jaw. On October 24, 1984, after a TMJ examination, D'Amour diagnosed LC as having TMJ disorder. LC testified that D'Amour explained to her that the TMJ dysfunction was probably related to a pinched nerve in her neck. According to LC, D'Amour told her that he wanted to photograph her naked in order to present the photographs at a medical seminar. D'Amour explained to LC that he would need to mark her back, and that therefore her back would have to be exposed. LC asked if she could wear a bathing suit, and D'Amour explained to her that it would be difficult to mark her back if she wore a bathing suit. D'Amour told LC that he had taken photographs of nude patients in the past, and that he would reduce her treatment costs if she allowed him to take the photographs. LC testified that she asked D'Amour if she could bring her mother to the photograph session, and that D'Amour agreed. LC also asked D'Amour whether she could see the photographs of the other nude patients, and D'Amour told her that he would show them to her when she came in to have the photographs taken.

On October 30, 1984, LC and her mother arrived at D'Amour's office after it closed for business. D'Amour showed LC a set of photographs which he had taken of another nude patient. After D'Amour took a few photographs of LC's mouth, she once again asked him if she could wear a bathing suit. D'Amour explained that, if she wore the bathing suit, it would be difficult to mark her back. LC then went into another room, and changed into a beach towel. When LC returned, D'Amour marked her back with the marker and proceeded to take several photographs of her back. He

then asked LC to take the towel off; after hesitating for a couple of minutes, she dropped the towel. D'Amour took additional photographs of LC's back, and then asked her to turn around, and proceeded to take more photographs. At one point, D'Amour touched LC's pelvic area and asked her to place her thumbs in that area. LC's mother was in the room as D'Amour took the photographs.

D'Amour's testimony regarding the nude photographs was essentially the same as LC's, except D'Amour claimed that: (1) he suggested taking the photographs *after* LC volunteered to assist him with his research; (2) he suggested that LC bring a chaperon; and (3) LC, on the night in which the photographs were taken, never mentioned to him that she had brought a bathing suit.

D'Amour testified that the photographs of LC had to be taken without any clothes because "the postural imbalances and distortions in body structures are best illustrated if the body is unencumbered by any form of restrictive clothing." Dr. Gerald Smith, a dentist who reviewed LC's medical records, testified that she "had a multitude of problems" including TMJ dysfunction, malocclusion, partial tilt of the head, shoulder and pelvic distortion, and chronic pain. Dr. Smith testified that it was not unusual for a dentist engaged in clinical research to photograph a nude patient in order to document postural distortions.

D'Amour used one close-up photograph of LC's face during a presentation titled "Workshop on Applied Kinesiology" sponsored by the Academy of Stress and Chronic Disease in Hartford, Connecticut, on November 15, 1984. D'Amour used a slide of another naked patient at the seminar. D'Amour testified that he did not use any of the nude photographs of LC because they were not the best examples of postural deformity.

The board found that, with the exception of a few photographs depicting LC's head, shoulders, hip, and back, the photographs "do not support [D'Amour's] testimony that the range of poses and angles in the photos taken of LC resulted from his effort 'to show the lineup of the cervical curvature

with the thoracic curvature with the lumbar curvature' based on the absence of any discernable scientific purpose to the photographs."[5] The board noted that an inspection protocol of the spine and extremities, admitted in evidence as an exhibit, recommended that "[t]o ensure a thorough examination of the hip joint and related areas, it is preferable that the patient disrobe completely. However, if doing so causes him discomfort or embarrassment, he may keep his underwear on." The board also noted that the photographs appearing in the excerpts of two articles related to postural deformities, admitted in evidence as exhibits, were of fully clothed patients. The board concluded that D'Amour's taking of nude photographs as part of his "alleged 'clinical research' was inappropriate, without scientific or professional basis, and constituted unethical behavior which violated his professional and fiduciary relationship with the patient, had the potential to undermine the public's confidence in the dental profession, and constituted gross misconduct in the practice of dentistry, in violation of [G. L. c. 112, § 61]." The board suspended D'Amour's license for three years.

2. *Due process.* D'Amour argues that his right to due process was violated because the board failed to provide him with an impartial hearing. D'Amour contends that he was

_____

[5]The board described the photographs as follows: "The 36 slides taken by [D'Amour] of LC include five slides of LC's back, nineteen side/front views, eight frontal views, three slides of LC lying on the floor with her thumbs on her pelvic area, and one slide too dark to read. None of the slides show LC's lower legs and feet or include the surface which she was standing on when the pictures were taken. The side/front views do not validly depict any postural deformities since, in each view, either LC's hands or arms are covering her hips or her full shoulders, head or hips are not included in the picture. The frontal view slides are similarly deficient in documenting any postural relationships since, except for one or two slides, they are focused on the area from the top of LC's breasts to just below her pubic area and do not include either her full shoulders, hips, or head. Notwithstanding the placement of LC's thumbs on her pelvic bones, no scientific purpose is evident in the close-up views of LC lying on her back. One of the photos of LC lying on her back was taken from the angle of LC's feet looking towards her head with the camera level with her thighs. This slide is focused on LC's mid-thighs to her breasts (no shoulders or head included) with a full view of her pubic area."

denied due process when Dr. Walter Guralnick, the chairman of the board, solicited the participation of an expert witness to testify at the hearing.

Administrative agencies and boards, by their very nature, have a dual investigative and adjudicative function. The United States Supreme Court in *Withrow* v. *Larkin*, 421 U.S. 35, 56 (1975), held that this dual function does not violate principles of due process of law. In *Raymond* v. *Board of Registration in Medicine*, 387 Mass. 708 (1982), we rejected a physician's argument that his due process rights were violated when, inter alia, "the member of the board who moved that the order to show cause be served upon [the physician] was thereafter appointed hearing officer and conducted the hearing." *Id.* at 714-715. In *Craven* v. *State Ethics Comm'n*, 390 Mass. 191, 198-199 (1983), we held that the alleged participation by the chairman of the State Ethics Commission in the decision authorizing a preliminary inquiry in the conduct of the plaintiff, in addition to his participation in the issuance of an order to show cause, and his sitting as hearing officer, did not deprive the plaintiff of due process. D'Amour was not denied the right to an impartial hearing simply because the chairman of the board asked an expert to testify at the hearing.

D'Amour also alleges that Dr. Guralnick had a personal bias against him. In support of this allegation, D'Amour points to the fact that Dr. Guralnick interrupted the hearing and made a statement defending himself against allegations made by D'Amour's attorney during the cross-examination of the expert witness whom Dr. Guralnick asked to testify.[6]

---

[6]Dr. Guralnick, after asking the hearing officer if he could make a statement, said the following: "I resent very much the implication that this Board is biased and that the chairman is biased. This Board has never gone on any witch hunts against dentists. Its officers are and Board members have tried to be as fair handed as they can be in all hearings and in all complaints brought before it and I think counsel owes the Board and me an apology for implying that there is some sort of collusion between me and Dr. Keith, who is a recognized authority in his field, as I have been at one time a recognized authority in the same field, could be with any other thousand, hundred oral surgeons, we could have brought here as witnesses,

We do not think that the interruption by Dr. Guralnick overcomes the assumption that "state administrators 'are . . . men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.' " *Raymond* v. *Board of Registration in Medicine, supra* at 716, quoting *Withrow* v. *Larkin, supra* at 55. In any event, even if we were to assume that Dr. Guralnick's statement during the hearing demonstrated a bias against D'Amour, there was no due process violation since Dr. Guralnick did not act as the hearing officer, and also recused himself from any deliberations by the board. See *Raymond* v. *Board of Registration, supra* at 717.

3. *Substantial evidence.* D'Amour argues that the board's decision is unsupported by substantial evidence. "The scope of review under the State Administrative Procedure Act, G. L. c. 30A, § 14 [1988 ed.], is circumscribed. . . . We must uphold the decision of the board where, considering the entire record, its findings are supported by substantial evidence." (Citation omitted.) *Langlitz* v. *Board of Registration of Chiropractors*, 396 Mass. 374, 379 (1985). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1 (6). *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 466 (1981). "While we must consider the entire record, and must take into account whatever in the record detracts from the weight of the [board's] opinion, . . . as long as there is substantial evidence to support the findings of the [board], we will not substitute our views as to the facts" (citation omitted). *Cherubino* v. *Board of Registration of Chiropractors*, 403 Mass. 350, 354 (1988), quoting *Arthurs* v. *Board of Registration in Medicine*, 383 Mass. 299, 304 (1981). We

as experts whom I know as well as I know Dr. Keith. And I deeply feel that the Board has been insulted by this implication and I would like that to be recorded."

D'Amour also alleges that Dr. Guralnick was biased because Guralnick testified against him at a prior proceeding. There is nothing in the record to substantiate this claim.

proceed to apply this standard of review to each of the board's findings.

a. *JC*. The board's conclusion that D'Amour violated G. L. c. 112, § 61, when he failed to observe, document, and discuss JC's cancerous lesion, and inserted the dentures after observing the lesion, was supported by substantial evidence.

Dr. Charkoudian, an oral surgeon, testified that JC's lesion was probably obvious on May 2, 1986, during JC's first visit to D'Amour, and was certainly obvious on May 21, 1986, the day on which D'Amour inserted the dentures. Dr. Charkoudian's testimony was especially compelling since he observed the lesion on May 22, 1986. The board did not believe D'Amour's testimony that he noticed the cancerous lesion, but did not write it in his treatment notes because JC assured him that he was receiving treatment from a physician for the condition. "The board, and not this court, has the responsibility of deciding preliminary questions of credibility and the weight of the evidence; the board was not required to believe . . . [D'Amour's] testimony." *Cherubino* v. *Board of Registration of Chiropractors*, *supra* at 356.

The board heard testimony from Dr. Charkoudian that D'Amour violated the standard of care when he inserted the dentures without first referring JC to an oral surgeon. The board also heard testimony from Dr. White, an oncologist, who stated that D'Amour met the standard of care when he made sure that JC was receiving treatment for the condition. D'Amour suggests that greater weight should be given to Dr. White's testimony since he, and not Dr. Charkoudian, is a cancer expert. We believe that this is the type of decision which falls within the expertise of the board, and therefore, we will not displace the board's choice between the two conflicting views. See *Cherubino* v. *Board of Registration of Chiropractors*, *supra* at 355; *Langlitz* v. *Board of Registration of Chiropractors*, *supra* at 381. See also *Embers of Salisbury, Inc.* v. *Alcoholic Beverages Control Comm'n*, 401 Mass. 526, 529 (1988).

b. *BP*. The board's conclusion that D'Amour did not adequately inform BP and her parents as to what they could

reasonably expect from the treatment he provided was supported by substantial evidence.

DP testified that D'Amour told her he would improve BP's scoliosis through the TMJ dysfunction treatment. D'Amour denied that he had ever made the statement. Again, it is for the board to determine the credibility of the witnesses and to resolve factual disputes. *Cherubino* v. *Board of Registration of Chiropractors, supra* at 356. *Embers of Salisbury, Inc.* v. *Alcoholic Beverages Control Comm'n, supra*. It was also within the board's discretion to use its expertise in order to choose among conflicting medical testimony regarding the effect of TMJ dysfunction treatment on scoliosis. See *Langlitz* v. *Board of Registration of Chiropractors, supra*.

c. *LC*. The board's conclusion that D'Amour engaged in gross misconduct in the practice of his profession by taking nude photographs of LC was not supported by substantial evidence.[7]

The board concluded that the photographs lacked a "scientific or professional basis." There was not sufficient evidence in the record for the board to have made this determination. "The board may put its expertise to use in evaluating the complexities of technical evidence. However, the board may not use its expertise as a substitute for evidence in the record." *Arthurs* v. *Board of Registration in Medicine, supra* at 310. "[A]n agency or board may not sit as a silent witness where expert testimony is required to establish an evidentiary basis for its conclusions." *Langlitz* v. *Board of Registration of Chiropractors, supra* at 381.

---

[7]D'Amour argues that his due process rights were violated when the board, in the part of its decision involving the nude photographs of LC, "failed to identify or establish any standard of applicable professional conduct." The board applied the standard of professional conduct contained in G. L. c. 112, § 61. We have stated that "gross misconduct" within the meaning of § 61, see note 4, *supra*, "is not too indefinite as a ground for discipline of a registered [professional] by the board." *Forziati* v. *Board of Registration in Medicine*, 333 Mass. 125, 128 (1955). See *Hellman* v. *Board of Registration in Medicine*, 404 Mass. 800, 804 (1989) (defining "gross misconduct").

The only evidence in the record relied upon by the board in evaluating the scientific or professional validity of the photographs was: (1) an examination protocol which recommends that in order to examine thoroughly the "hip joint and related areas" it is preferable that the patient be naked, but, if the patient is embarrassed, he may wear his underwear; and (2) excerpts of two articles which discuss postural deformities and which include photographs of patients who are fully clothed. We do not think that these three documents constitute a sufficient evidentiary basis upon which the board could have concluded that the photographs in question lacked a scientific or professional basis, especially since Dr. Smith testified that it is not unusual for a dentist involved in certain types of clinical research to take photographs of nude patients. "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *New Boston Garden Corp.* v. *Assessors of Boston, supra* at 466, quoting *Cohen* v. *Board of Registration in Pharmacy*, 350 Mass. 246, 253 (1966).[8]

Since the record contains very little evidence which questions the scientific or professional validity of the photographs, we can assume that the board relied mainly on its expertise

---

[8]The board, in its factual findings, summarized the testimony of all the witnesses, except for Dr. Smith's testimony regarding the scientific and professional value of having a dentist take photographs of a nude patient. The relevant testimony of Dr. Smith was as follows:

Q. "Doctor, would you then consider it unusual for a dentist to examine a patient's pelvic area during a routine examination of a TMJ dysfunction patient?

A. "Not at all. Expecially [*sic*] when one is versed in the total concept of physiologic dentistry.

Q. "Doctor, would you consider it unusual if a dentist photographed a patient in the nude to document pelvic, spinal or shoulder distortions as they relate to the TMJ dysfunction or treatment?

A. "I wouldn't find it unusual at all. Especially an individual who lectures, an individual who's conducting clinical research. And an individual who, you know, is in the forefront of his field. That's how progress, you know, comes about. It's not doing the same thing over and over again. It's breaking new waters and the information that's obtained through clinical examination and documentation is what provides the change that occurs in any profession."

in reaching its conclusions. When an agency or board relies on its expertise, it must put in the record the basis for that expertise. See *Arthurs* v. *Board of Registration in Medicine, supra* at 309. See also *Morris* v. *Board of Registration in Medicine,* 405 Mass. 103, 113, cert. denied, 493 U.S. 977 (1989) ("board exceeded its proper role in announcing, with no expert evidence in the record to support it, that its special expertise permits it to identify 'red flags indicative of sexual abuse' "). The board is not required to introduce .expert evidence in every case; if there is a sufficient evidentiary basis upon which the board can apply its expertise, the board may evaluate the facts without the assistance of expert evidence. See *Langlitz* v. *Board of Registration of Chiropractors, supra.*[9] The board, however, "must make certain that sufficient evidence is in the record for a court to review the evidence on which the agency relies." *Arthurs* v. *Board of Registration in Medicine, supra* at 310.

The board in this case failed to put in the record the basis for the expertise which it used to evaluate the photographs and, as a result, the record does not contain sufficient evidence for us properly to review the board's conclusion that the photographs lacked a scientific or professional basis. The board substituted its expertise for evidence. The board's finding that D'Amour engaged in gross misconduct in the practice of his profession was not supported by substantial evidence.[10]

4. *Conclusion.* The judgment of the single justice is to be amended so as to vacate so much of the board's decision as

---

[9] If appropriate, the board may take administrative notice of the standard of care. *Langlitz* v. *Board of Registration of Chiropractors, supra* (board took notice of own regulations which established scope of chiropractic care and nature of supportive procedures). See *Arthurs* v. *Board of Registration in Medicine, supra* at 310; G. L. c. 30A, § 11 (5).

[10] The board found that D'Amour continued to charge LC after he told her that he would not do so if she agreed to be photographed. It appears that this played a relatively minor role in the board's decision to suspend D'Amour's license for three years. The core of the board's accusations revolved around the claimed lack of a scientific or professional basis for the photographs.

imposed sanctions on D'Amour for photographing LC in the nude, and to remand the matter to the board for further consideration consistent with this opinion. In all other respects the judgment is affirmed.

*So ordered.*