EDWARD M. DANIELS *vs.* BOARD OF REGISTRATION IN
MEDICINE.

Suffolk. May 5, 1994. - July 18, 1994.

Present: LIACOS, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Administrative Law*, Adjudicatory proceeding, Substantial evidence. *Due
Process of Law*, Notice, Hearing, Adjudicatory proceeding. *Notice.
Witness*, Expert. *Constitutional Law*, Impartial tribunal. *Evidence*, Ad-
ministrative proceeding, Credibility of witness, Expert opinion. *Board
of Registration in Medicine. Doctor*, License to practice medicine.

The provisions of G. L. c. 30A, the State Administrative Procedure Act,
and regulations thereunder, do not require that the Board of Registra-
tion in Medicine grant a physician a separate hearing on his objections
to an administrative magistrate's recommended decision in a discipli-
nary matter, in addition to the hearing that the board may, in its dis-
cretion, order with respect to any sanctions it proposes to impose on the
physician. [383]

In a disciplinary proceeding brought against a physician by the Board of
Registration in Medicine, the physician was not entitled on due process
grounds to a hearing not otherwise required by statute or regulation on
his written objections to the administrative magistrate's recommended
decision, where due process considerations were satisfied by proper no-
tice and a meaningful opportunity to be heard during the six-month
long hearing and by the board's having offered the physician an oppor-
tunity to make an oral argument on those objections, which the physi-
cian had waived. [383-384]

There was no evidence to support assertions by a physician in a discipli-
nary matter that the Board of Registration in Medicine violated the
confidentiality provisions of G. L. c. 112, § 5, with respect to a particu-
lar proceeding or that any publicity attendant to the matter had im-
properly influenced the board's decision. [384-385]

Substantial evidence supported the findings of the Board of Registration in
Medicine that a psychiatrist engaged in sexual conduct with four of his
patients which constituted "malpractice, gross misconduct or miscon-
duct in the practice of medicine," warranting the revocation of his li-
cense to practice medicine. [385-389, 393]

Substantial evidence supported the findings of the Board of Registration in
Medicine that the four patients who testified that a psychiatrist en-

gaged them in sexual conduct during the course of his treatment of each of them were credible and suffered no disorder affecting their abilities to perceive and recall those events and that the physician did not prove that he could not have had sexual contact with his patients; there was no merit to the physician's assertion that the board relied on its own expertise rather than the record of disciplinary proceedings, including expert testimony, in making its findings. [389-393]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on July 31, 1992.

The case was reported by *Greaney*, J.

The case was submitted on briefs.

*William H. Rowerdink, III,* for the plaintiff.

*Scott Harshbarger,* Attorney General, *Amy Spector & Margaret Monsell,* Assistant Attorneys General, for the defendant.

LYNCH, J. The plaintiff appeals from a decision of the Board of Registration in Medicine (board) revoking his license to practice medicine in the Commonwealth. Pursuant to an order of reference by the board, an administrative magistrate held an evidentiary hearing and found that the plaintiff had had sexual contact with four of his patients, which conduct constituted "malpractice, gross misconduct or misconduct in the practice of medicine, and practicing medicine with gross incompetence or negligence on a particular occasion or negligence on repeated occasions," as proscribed by G. L. c. 112, §§ 5 (*c*), 61, and 62 (1992 ed.), and 243 Code Mass. Regs. § 1.03 (5) (a) (3), (5), and (18) (1993). The board adopted the administrative magistrate's findings of fact and conclusions of law and revoked the plaintiff's license to practice medicine in the Commonwealth. Pursuant to G. L. c. 112, § 64 (1992 ed.), the plaintiff appealed from the board's decision to a single justice of this court arguing, among other things, that under the applicable statutes and regulations and as a matter of due process as guaranteed by the Fourteenth Amendment to the United States Constitution, he was entitled to a hearing on his objections to the magistrate's recommended decision uncontaminated by con-

sideration of any sanction that might be imposed. In addition he argues that the board's decision was not supported by substantial evidence. The single justice reported the case to the full court. We affirm the board's decision.

1. *Prior proceedings.* On September 5, 1990, the board issued a statement of allegations which alleged that the plaintiff engaged in sexual contact with four patients beginning in the early 1960's and ending in the early 1980's, and ordered the plaintiff to show cause why he should not be disciplined for the described conduct. The plaintiff denied the allegations and the matter was referred to the Division of Administrative Law Appeals. An administrative magistrate conducted an evidentiary hearing, and on May 8, 1992, the magistrate issued a decision, recommending that the board impose appropriate sanctions on the plaintiff. On May 18, 1992, the board notified the plaintiff that it intended to make a final disposition on June 24, 1992, and permitted counsel to file a memorandum addressing the sanction to be imposed within seven days of receipt of the notice. On May 20, 1992, the plaintiff filed his objections to the magistrate's recommended decision and on May 27 requested a hearing to argue his position.[1] On June 1, 1992, the board denied his request for a separate hearing on the objections, stating that it would consider the plaintiff's objections along with any memorandum on sanctions when it considered the recommended decision. The board noted that "[t]he filing of a memorandum on sanction is not considered a waiver of objections, but is understood to be the party's position on sanction in the event that the Board does not agree with the objections." The board advised the plaintiff to file a memorandum on sanctions immediately.

The plaintiff, through his counsel, refused to participate in the June 24 hearing. The board thereafter adopted the mag-

---

[1]Although the plaintiff's objections apparently were filed twelve days after the magistrate issued his recommended decision, the board does not contend that they were not timely filed. See 801 Code Mass. Regs. § 1.01 (10) (n) (1) (1993) (regulations require objections to be filed within seven days of receipt of decision).

istrate's recommended decision and ordered that the plaintiff's license to practice medicine be revoked.

2. *General Laws c. 30A.* The plaintiff claims that G. L. c. 30A (1992 ed.), the State Administrative Procedure Act (act), supports his contention that separate hearings are required. The act provides that "an opportunity is afforded each party adversely affected to file objections and to present argument, *either orally or in writing as the agency may order*, to a majority of the officials who are to render the final decision" (emphasis supplied). G. L. c. 30A, § 11 (7) (*b*). Moreover, 801 Code Mass. Regs. § 1.01 (10) (n) (1) (1993) specifies that, with regard to objections, "[t]he Presiding Officer or Agency shall have the *discretion* to allow or order the Parties to argue orally" (emphasis supplied). Nothing in the act requires that the board allow the plaintiff a hearing on his objections and nothing in the act or regulations supports his contention that separate hearings are required.

The plaintiff again cites no relevant authority for his position that the hearing on the objections and the hearing on sanctions should be separate and distinct from one another and that a combined hearing would diminish the integrity of his objections. "[W]e defer to the board's determination as to how it should proceed as long as its actions are consistent with the requirements of due process and G. L. c. 30A." *Arthurs* v. *Board of Registration in Medicine*, 383 Mass. 299, 316 (1981).

3. *Procedural due process.* The plaintiff next contends that he was entitled to a hearing on his written objections to the magistrate's decision in advance of and separate from a hearing on the appropriate sanction as a matter of procedural due process.

The hallmarks of due process are notice and "an opportunity to be heard at a meaningful time and in a meaningful manner." *Matter of Tobin*, 417 Mass. 92, 101 (1994), quoting *Matter of Kenney*, 399 Mass. 431, 435 (1987). *Goldberg* v. *Kelly*, 397 U.S. 254, 267 (1970). The plaintiff was given notice and a meaningful opportunity to be heard throughout the course of a six-month evidentiary hearing. The plaintiff's

argument that separate hearings are required is not supported by any accepted interpretation of due process or by other meaningful precedent, and we therefore conclude that his procedural due process rights were satisfied.[2]

Notwithstanding the absence of a due process or statutory mandate, the board offered him the opportunity to make an oral argument on his objections at the June 24, 1992, hearing. Having chosen not to participate in the hearing, the plaintiff waived any right he might have had to oral argument. Cf. *Doten* v. *Doten*, 395 Mass. 135, 137-138, 141-142 (1985).

We also find no merit in the plaintiff's assertion that the board did not provide adequate or fair notice of the hearing on his objections. On June 1 the board responded to the plaintiff's request for a hearing on his objections by stating that it would hear his argument at the June 24 hearing. Given that his written objections had already been submitted on May 20, the plaintiff had ample notice of his opportunity to argue his objections.

4. *Right of privacy.* The plaintiff asserts that, immediately following the issuance of the magistrate's recommended decision, the Boston Globe newspaper published an article which described the decision and quoted the attorney representing three of the patients involved as saying that the board had no alternative but to revoke the plaintiff's license to practice medicine. The plaintiff contends that the board published the magistrate's decision before the plaintiff had an opportunity to file his objections, which violated G. L. c. 112, § 5,[3] and diminished the board's impartiality thereby rendering it inca-

----

[2]We note that a respected administrative law scholar unequivocally asserts that due process does not require an opportunity to present oral argument. 2 K.C. Davis, Administrative Law § 10:9 (2d ed. 1979).

[3]General Laws c. 112, § 5 (1992 ed.), provides in pertinent part that the board "shall keep confidential any complaint, report, record or other information received or kept by the board in connection with an investigation . . . provided, however, that . . . [such information] shall not be kept confidential after the board has disposed of the matter under investigation by issuing an order to show cause, by dismissing a complaint or by taking other final action."

pable of considering the plaintiff's objections fairly or fully.[4] Since the article was published after the order to show cause, it is difficult to attach much substance to the plaintiff's claim that the publication somehow infringed on his rights.

The record is devoid of any evidence that the board released the magistrate's decision. Additionally, the plaintiff has not shown that the alleged newspaper article in any way influenced the board's decision. "This is not a case in which it appears 'that the probability of actual bias on the part of the . . . decisionmaker is too high to be constitutionally tolerable.'" *Varga* v. *Board of Registration of Chiropractors*, 411 Mass. 302, 307 (1991), quoting *Withrow* v. *Larkin*, 421 U.S. 35, 47 (1975). The plaintiff's unsupported speculation that public opinion influenced the board is insufficient to establish bias. Moreover, G. L. c. 112, § 5, specifically states that the information obtained by the board is no longer confidential after the board issues an order to show cause. The board issued an order to show cause on September 5, 1990, long before hearings on this matter began and long before the Boston Globe article allegedly was published.

5. *Substantial evidence*. The plaintiff next argues that the board's decision is not supported by substantial evidence. " 'Substantial evidence' means such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1 (6). It becomes necessary, therefore, to review the evidence before the agency. "While we must consider the entire record, and must take into account whatever in the record detracts from the weight of the agency's opin-

---

[4]The plaintiff also contends that the publication of the magistrate's decision violated the plaintiff's constitutional right of privacy protected by the Fourteenth Amendment, as well as his statutory right to privacy under G. L. c. 214, § 1B (1992 ed.). Nothing in the record supports the plaintiff's contention that the board published the magistrate's decision. Moreover, the record does not reflect that the plaintiff raised this privacy claim before the board in his objections or otherwise. As such, particularly where the factual predicate of his argument is not in the record, we decline to consider the issue raised for the first time on appeal. See *Friedman* v. *Board of Registration in Medicine*, 408 Mass. 474, 479 (1990), cert. denied, 498 U.S. 1107 (1991), *S.C.*, 414 Mass. 663 (1993).

ion, *Cohen* v. *Board of Registration in Pharmacy*, 350 Mass. 246, 253 (1966), as long as there is substantial evidence to support the findings of the agency, we will not substitute our views as to the facts." *Arthurs* v. *Board of Registration in Medicine, supra* at 304, and cases cited. "We are concerned with how the board arrived at its decision and with the evidence on which it relied." *Id.* at 305. We review the evidence before the magistrate to determine whether substantial evidence existed.

The magistrate credited the testimony of Patient A that she first started seeing the plaintiff in the summer of 1960 when she was in Boston visiting her sister. She subsequently enrolled in a Boston area college and saw the plaintiff for psychotherapy three times a week from October of 1961 until June of 1962 when she began to see him seven times a week. One day during the summer of 1962, the plaintiff asked Patient A to scratch his back and she did. After a period of time and during a therapy session, the plaintiff asked whether he could take his shirt off so that Patient A could scratch his back. After another period of time he asked Patient A to scratch his buttocks without his pants on and eventually asked Patient A to perform fellatio on him. After another period of time, the plaintiff and Patient A began to engage in sexual intercourse. The plaintiff had sexual contact, including sexual intercourse and other sexual acts, with Patient A at intervals of from once a week to once a month between 1963 and 1965, and daily between April, 1966, through September, 1967. The last sexual contact between Patient A and the respondent occurred in October of 1977. The plaintiff frequently used "four letter words" in his conversations with Patient A. She was able to describe physical characteristics of the plaintiff. The magistrate found that Patient A does not have any mental disorder, nor had she in the past, that affects her ability to perceive and to recall the relationship that existed between herself and the plaintiff.

Based on the testimony of Patient B the magistrate found that she initially sought treatment from the plaintiff for depression and marital problems when she was pregnant with

her third child in 1960 or 1961. The plaintiff commented that he found her pregnancy attractive. The plaintiff, at patient B's request, held her hand during a session and responded to a question from patient B, answering, "I was thinking how nice it would be to be inside you." The plaintiff and Patient B had sexual intercourse and other sexual activity on the analytical couch during sessions from 1962 into the 1970's. She described similar characteristics of the plaintiff's body as Patient A described. During the course of treatment, the plaintiff revealed to Patient B many details of his personal and professional life. Additionally, he often used coarse language in discussing issues of sexuality. The magistrate found that Patient B does not have any mental disorder, nor had she in the past, that affects her ability to perceive and to recall the relationship that existed between herself and the plaintiff.

Patient C is a highly educated woman who holds a medical degree and a doctorate in education. Based on her testimony the magistrate found that she consulted the plaintiff in 1974 due to symptoms of obsession, paranoia, constant worrying, and fatigue. The plaintiff diagnosed her condition as anxiety and depression, and he recommended psychoanalysis and saw her five times a week or more until the summer of 1975. The plaintiff asked Patient C to focus on sexual fantasies and, when she had difficulty in discussing them, he told her to focus on him. Eventually, the plaintiff began to tell Patient C about himself and his physical complaints. In April of 1974, Patient C offered to give the plaintiff a back rub and while she rubbed his back, she discussed her sexual fantasy of having sexual intercourse with him. These back rubs and sexual discussions continued until the plaintiff told Patient C that they could have sexual intercourse. Thereafter, three or four times a week, they had sexual intercourse or Patient C would rub the plaintiff's back if he was tired or not feeling well. Patient C described the plaintiff's physical characteristics in a similar manner to Patients A's and B's descriptions. In the fall of 1975, Patient C entered medical school in another

State but saw the plaintiff again in the summer of 1976 and resumed physical and sexual contact.

In January of 1982, Patient C wrote to the plaintiff and expressed her concern that he had failed to provide therapy to her and requested the amount of $20,000, the amount she estimated she paid to him for treatment. The plaintiff sent her a check dated January 18, 1982, for $20,000. The magistrate found that Patient C does not have any mental disorder, nor had she in the past, that affects her ability to perceive and to recall the relationship between herself and the plaintiff.

Similarly, the magistrate credited the testimony of Patient D, who saw the plaintiff in analysis from October 2, 1978, until July or August, 1983, for four forty-five minute sessions each week. In December of 1979, the plaintiff and Patient D increased the amount of physical contact with each other during the sessions. For the following year to year and one half, the plaintiff would lie down with Patient D on the couch and stroke her genital area until she climaxed. Their last sexual contact was in 1981. In 1988, when Patient D expressed her anger with the plaintiff and told him he never should have let a sexual relationship develop, the plaintiff admitted to Patient D that she was right. The magistrate found that Patient D does not have any mental disorder, nor had she in the past, that affects her ability to perceive and to recall the relationship that she had with the plaintiff.

With the exception of a few notes that the plaintiff made at the outset of treatment of Patients A and B, the magistrate found that the plaintiff kept no notes or records of his diagnosis, course of treatment, or progress of Patients A, B, C, or D. He neither prescribed any medication nor recommended hospitalization for any one of them.

In its conclusion, the board stated that "[t]he [plaintiff] attempted to corroborate and reinforce his denial that any sexual activity occurred between himself and his patients in two ways. First, he portrayed his patients as being borderline psychotics, who are unable to distinguish between facts and fantasies. Secondly, he argued that his own physical short-

comings and maladies rendered him impotent." The board adopted the magistrate's conclusion that each of the witnesses was "believable, credible and truthful. Their appearance, their candor, their understanding of their own mental health conditions, their activities, their courses of treatment, the diagnoses of other treating physicians all lead to the inescapable conclusion that none of these women are or were psychotic or suffered any impairment from distinguishing fact from fantasy and that each of them engaged in sexual contact with the [plaintiff]."

The board also concluded that the evidence as to the plaintiff's numerous physical problems including angina, gout, arteriosclerosis, diabetes, and hypercholesterolemia did not "establish that the [plaintiff] was impotent prior to August, 1975 and thus unable to have sexual intercourse with [Patients] A, B and C, or that he was unable to masturbate [Patient] D in 1980 and 1981." The magistrate observed that he did not find the testimony of the plaintiff or one of his physician's notes that the plaintiff complained of impotency since sometime in the late sixties reliable.

6. *Expert testimony.* The magistrate concluded that the patient witnesses were credible. "The administrative magistrate's determination on the credibility of the former patient and [the plaintiff] is controlling. Neither this court nor the board would be warranted in rejecting that determination." *Palmer* v. *Board of Registration in Medicine*, 415 Mass. 121, 124 (1993).

The plaintiff argues that the board relied on its own expertise, however, in concluding that Patients A, B, C, and D suffered no impairment that would affect their ability to remember, to recall, or to relate their experiences with the plaintiff. "The board may put its expertise to use in evaluating the complexities of technical evidence. However, the board may not use its expertise as a substitute for evidence in the record." *D'Amour* v. *Board of Registration in Dentistry*, 409 Mass. 572, 583 (1991), quoting *Arthurs* v. *Board of Registration in Medicine*, *supra* at 310. "An agency or board may not sit as a silent witness where expert testimony is re-

quired to establish an evidentiary basis for its conclusions." *D'Amour* v. *Board of Registration in Dentistry, supra,* quoting *Langlitz* v. *Board of Registration of Chiropractors,* 396 Mass. 374, 381 (1985).

There was substantial evidence in the record from which the board could conclude that Patients A, B, C, and D suffered no impairment that would affect their ability to remember, to recall, or to relate their experiences with the plaintiff. Rather than relying on its own expertise, the board could have relied on the testimony of Dr. James C. Beck, a board certified psychiatrist. Dr. Beck interviewed Patients A and B on three occasions each, and evaluated and treated Patient D. He testified that he detected absolutely nothing in Patients A, B, and D's psychiatric status that would have impaired their ability to perceive, to remember, or to relate what occurred with the plaintiff. Neither did he detect any difficulty in their ability to distinguish between dreams, fantasies, and the reality of their relationships with the plaintiff.[5] The evidence also showed that a treating psychiatrist of Patient C diagnosed her as obsessive compulsive neurotic. Although Dr. Beck did not evaluate Patient C, he did offer an opinion that a diagnosis made by a treating psychiatrist of obsessive compulsive neuroses does not imply a break with reality or a psychoses. Additionally, Patient C testified that the plaintiff told her that he had diagnosed her as having anxiety and depression and that her treatment should be psychoanalysis.

The magistrate stated that he relied in part on other treating psychiatrist's diagnoses, the patients' testimony, and his own observations of the witnesses in concluding that the witnesses were credible and suffered no mental disorder that affects their ability to perceive and to recall the relationship that existed between them and the plaintiff. Moreover, the plaintiff presented little credible evidence that the witnesses

---

[5]The plaintiff argues that Dr. Beck did not perform a sufficiently extensive evaluation of the patients to determine whether they suffered from borderline personality or psychoses. However, he points to no medical standards to support his contention.

were "borderline" personalities. The plaintiff's evidence that the patients were so impaired came from his own testimony that he diagnosed them as such when they were his patients. He made no contemporaneous notes of his diagnoses and treatments of these patients, however, and the patients testified that the plaintiff related no such diagnoses and prescribed no medications.

The plaintiff also presented testimony from Dr. James A. Kleeman, a board certified psychiatrist and a personal friend of the plaintiff for forty-seven years. Dr. Kleeman testified that he reviewed the trial transcripts and deposition transcripts of the patients' testimony but never personally met any of the patient witnesses. He testified that, from the transcripts and from discussions with the plaintiff about the patients, he determined that they all suffered from psychological impairments.[6] He also testified that he did not believe the allegations against the plaintiff, did not believe the current statistics on the incidence of psychotherapist-patient sexual abuse, and he blamed the "women's movement" for creating a "fad" of bringing such lawsuits.

We conclude that the magistrate acted well within his discretion in crediting the evidence presented by the board over that of the plaintiff and his witnesses. His determination was based on substantial evidence, and we shall not disturb his credibility assessments.

The board's conclusion that the evidence of the plaintiff's physical infirmities did not prove that he could not have been sexually active as described by his patients is also supported in the record. The plaintiff apparently contends that, because

---

[6]He testified that Patient A was borderline in that she varied between psychotic and neurotic thinking. He found Patient B's testimony to be "very difficult to believe," and that the number of therapists she had seen after seeing the plaintiff, some eighteen to twenty, was "very, very strange." He determined that Patient C suffered from paranoid ideation, "Where a person attributes things that are really happening within themselves . . . to circumstances or people outside of themselves." Finally, he determined that Patient D "had major difficulties with men . . . [and] that the accusation that she made of [the plaintiff's] behavior [was] pretty preposterous."

his physicians testified that he reported to them that he was impotent; the magistrate had to conclude that the plaintiff could not have had sexual intercourse or contact as reported by the patients. However, "[t]he law should not, and does not, give the opinions of experts on either side of . . . [a]n issue the benefit of conclusiveness, even if there are no contrary opinions introduced at the trial." *Commonwealth* v. *DeMinico*, 408 Mass. 230, 235 (1990), quoting *Commonwealth* v. *Lamb*, 372 Mass. 17, 24 (1977). It is apparent from the record that none of his treating physicians actually evaluated his complaints of impotency. Their testimony that diabetes can be associated with impotency did not establish that the plaintiff's diabetes made him impotent. Although the record reflects that the plaintiff was chronically obese, diagnosed with diabetes in the early 1960's, and subsequently developed gout, arteriosclerosis, and angina, the magistrate concluded that these diagnoses do not establish that the plaintiff was unable to have sexual relations with the patients during the time periods reported.

To support its conclusion that the reported sexual activity occurred, the board cites evidence in the record which, it asserts, reinforces the testimony of the four patients:

"1. The similarity of the evolvement of sexual activities between the [plaintiff] and [Patients] A and C which began with backrubs.

"2. The similarity of the evolvement of the sexual activities between the [plaintiff] and [Patients] B and D which began with hugs.

"3. The coarse language that the [plaintiff] used with [Patients] A and B when discussing sex.

"4. The consistent description of the [plaintiff's] body including his penis by [Patients] A, B and C.

"5. The strong feelings of affection that each of the patients felt toward the [plaintiff], including the satisfac-

tion that [Patients] A and C experienced in their belief that the [plaintiff] needed them to care for him by giving him backrubs.

"6. The detailed and extensive information that the four patients related regarding the [plaintiff], which included not only his health condition, but also included intimate details of his personal and professional life.

"7. The letters that [Patient] A wrote and sent to the [plaintiff].

"8. The letter of [Patient] C dated January 10, 1982, which she sent to the [plaintiff] and his immediate payment to her of the twenty thousand dollars that she requested.

"9. The journal that was kept by [Patient] D."

Each of these statements is supported by the record. Moreover, whether sexual contact occurred is a question for the trier of fact, not an expert witness. Contrary to the plaintiff's contention, an expert's testimony as to whether the witnesses were telling the truth would be inappropriate. Cf. *Commonwealth* v. *Hudson*, 417 Mass. 536, 543 (1994).

After reviewing the entire record, we conclude that the board's decision was supported by the substantial evidence. The order revoking the plaintiff's license to practice medicine is affirmed.

*So ordered.*