JOHN D.[1] *vs.* DEPARTMENT OF SOCIAL SERVICES.

No. 98-P-1802.

Bristol. June 6, 2000. - March 7, 2001.

Present: JACOBS, BECK, & DUFFLY, JJ.

*Child Abuse. Child Neglect. Department of Social Services,* Registry of Alleged Perpetrators. *Evidence,* Verbal conduct, Sexual conduct. *Words,* "Sexual contact," "Oral statements."

An administrative hearing officer of the Department of Social Services correctly concluded that inappropriate, unwanted and sexually explicit statements made by a caretaker (stepfather) to his fifteen year old stepdaughter, without physical contact, constituted "sexual contact" within the meaning of 110 Code Mass. Regs. § 2.00 (1996), and thus sexual abuse, where the statements were not reasonably intended to provide information or direction for the child's education and physical and emotional well-being, and where there was evidence of a substantial risk of harm or emotional injury to the child. [128-132]

Evidence presented at an administrative hearing supported a finding of child neglect made by the Department of Social Services. [132-133]

CIVIL ACTION commenced in the Superior Court Department on April 3, 1996.

The case was heard by *John M. Xifaras,* J., on a motion for judgment on the pleadings.

*Max Volterra* for the plaintiff.

*Virginia A. Peel* for the defendant.

JACOBS, J. In this appeal, John D. contends that "[o]ral statements by themselves without evidence of physical and emotional injury do not constitute sexual abuse in the context of naming a perpetrator of sexual abuse under G. L.[] c. 119, § 51B[,] and the regulations thereunder." He also argues that the evidence

[1] A fictitious name.

was insufficient to support a finding of child neglect made by the Department of Social Services (DSS).

This case arises from a report made to the DSS under G. L. c. 119, § 51A, which alleged sexual abuse and neglect by John D. of his fifteen year old stepdaughter and neglect of his four year old daughter. After an investigation and report pursuant to c. 119, § 51B, DSS supported[2] that report, referred the allegation of sexual abuse to the district attorney,[3] and listed John D.'s name on its registry of alleged perpetrators.[4] An administrative hearing, termed a "fair hearing," was held pursuant to 110 Code Mass. Regs. § 10.00 (1993) and § 10.05 (1994), to consider

---

[2]After the completion of a G. L. c. 119, § 51B, investigation, DSS makes a determination whether the report's allegations are "supported" or "unsupported."

"To 'support' a report means that [DSS] has reasonable cause to believe that an incident (reported or discovered during the investigation) of abuse or neglect by a caretaker *did occur*. . . . 'Reasonable Cause to believe' means a collection of facts, knowledge or observations which tend to support or are consistent with the allegations, and when viewed in light of the surrounding circumstances and credibility of persons providing information, would lead one to conclude that a child has been abused or neglected." 110 Code Mass. Regs. § 4.32(2) (1996). (Emphasis original.)

[3]Pursuant to G. L. c. 51B(4), DSS is required to notify the district attorney if it has reasonable cause to believe a child has died, been sexually assaulted, or suffered or disclosed sexual assault or other specified harms, as a result of abuse or neglect. Although any action taken by the district attorney is not relevant to the proceedings in this case, we note there is no indication that criminal charges subsequently were filed against John D.

[4]DSS maintains a registry of alleged perpetrators pursuant to G. L. c. 18B, § 7(*b*), as a component of its central registry under G. L. c. 119, § 51F. See 110 Code Mass. Regs. § 4.36 (1996).

"The name of the alleged perpetrator shall be added to the Registry of Alleged Perpetrators if: (1) the allegation of child abuse or neglect has been supported and referred to the District Attorney . . . and (2) there is substantial evidence indicating that the alleged perpetrator was responsible for the abuse or neglect. . . .

"The name of the alleged perpetrator shall remain on the Registry of Alleged Perpetrators for 75 years or until the decision to list the name of the alleged perpetrator is reversed pursuant to 110 CMR 10.00 *et. seq.*, or by a court of competent jurisdiction." 110 Code Mass. Regs. § 4.37 (1996).

The consequences of adding a name to the registry of alleged perpetrators, see note 19, *infra*, are readily distinguishable from the requirement for registration and public notification under G. L. c. 6, §§ 178C-178O, of persons convicted of sex offenses. See *Doe, Sex Offender Registry Bd. No. 972* v. *Sex Offender Registry Bd.*, 428 Mass. 90, 90-95 (1998).

John D.'s challenge to the DSS decision. After that decision was upheld by the administrative hearing officer, John D. obtained a review in the Superior Court pursuant to G. L. c. 30A, § 14. The Superior Court judge affirmed the DSS decision.

We condense the factual background, as determined by the administrative hearing officer.[5] John D. is the stepfather of the older and the biological father of the younger of the two alleged victims. He had been married to their mother for about six years at the time the mother reported that the older daughter disclosed that John D. had told her he needed to examine her genitals because he suspected she had been sexually active with her eighteen year old boyfriend. The stepdaughter told the DSS investigator that John D. is a nudist, that she does not like seeing him nude, and that she disliked his entering the bathroom and starting conversations with her while she was in the bathtub. She reported that he asked her if she knew "how to give a 'blow job'" and if she had gone beyond kissing, and that he stated he would help her with kissing if she needed help. He also asked if he could see her hymen, while noting it would be alright if she declined, and telling her that she should not tell her mother of the request. She indicated that he regularly said things that were "weird." There also was evidence of incidents of physical confrontation between John D. and his wife, including that of the wife hitting him in the presence of the children.

In her decision, the administrative hearing officer stated that John D.'s "actions . . . coupled with his pattern of engaging in conversations replete with sexual themes and sexual activities constitute sexual contact." She also opined that sexual contact was not limited by DSS regulations to physical touching and that John D. engaged in "verbal sexual contact" with his stepdaughter.

---

[5]The documentary evidence at the hearing principally consisted of the DSS investigative report, also read into the hearing record, and several letters. No issue is raised with respect to the reliability of the investigative reports or their use in this case. For a criticism of DSS procedures, see Volterra, A Massachusetts Star Chamber in Process, 82 Mass.L.Rev. 347 (1998). In addition, testimony was given by three DSS staff persons. John D. testified and was represented by counsel who participated in the hearing. Neither the mother nor the alleged victims testified.

The principal issue in this case is the interpretation by DSS of its regulation at 110 Code Mass. Regs. § 2.00 (1996), defining abuse as:

"the non-accidental commission of any act *by a caretaker* upon a child under age 18 which causes, or creates a substantial risk of physical or emotional injury, or constitutes a sexual offense under the laws of the Commonwealth or any sexual contact between a caretaker and a child under the care of that individual." (Emphasis original.)

Because the validity of the regulation is not challenged,[6] and there is no claim of unlawful procedure, cf. *Arnone* v. *Commissioner of the Dept. of Social Servs.*, 43 Mass. App. Ct. 33, 34 (1997), and cases cited, the precise issue is whether the hearing officer correctly ruled that John D.'s "verbal sexual contact" in the context of his conduct with his stepdaughter and in the absence of physical contact, constitutes abuse.[7] While the noun "contact" is defined in Webster's Third New International Dictionary 490 (1993), as the "union or junction of body surfaces," it also is defined as "association or relationship," and

---

[6]The regulation defining "abuse" in its present form was promulgated in 1993 (dated December 1, 1993). That version substituted the wording "creates a substantial risk of physical or emotional injury" for the former 1988 language "creates a substantial risk of serious physical or serious emotional injury," and added the present clause "or any sexual contact between a caretaker and a child under the care of that individual." The term "sexual contact" was not defined in the revised regulation and remains undefined in the latest version, dated December 27, 1996. (Also, the 1993 revision of the regulation followed an amendment of G. L. c. 119, § 51A, effective on May 20, 1993. See note 16, *infra*.)

No issue was raised below, nor is any issue raised in this appeal, concerning the 1993 revision. We note that some of the conduct of John D. complained of may have occurred before the effective date of the revision. Also, the administrative hearing officer does not cite the dates of the regulations referred to in her decision. The Superior Court judge does not cite a date for the regulation at issue. Because the definition of abuse in 1993 has not changed through the current (1996) version of the regulations, and because John D. does not challenge the applicability of the regulation in its present form, we accept that version in conducting our review.

[7]There is no dispute that John D., the stepfather of the older child and the father of the younger child, is a caretaker as defined in 110 Code Mass. Regs. § 2.00 (1996).

"a condition or an instance of . . . communicating."[8] In the somewhat analogous circumstances of interpreting G. L. c. 209A protective orders, we have given a broad interpretation to the word "contact." See *Commonwealth* v. *Mendonca*, 50 Mass. App. Ct. 684, 687 (2001), and cases cited. We also do so here, using the nonphysical definition, because our focus is not limited to the precise nature of the interaction between parent and child, but additionally takes into account the purpose of that interaction and its potential effect upon the child.

That there is a broad range of possible communication between a parent (or caretaker) and a child on sexual subjects, is apparent from general experience and the dictionary definitions of "sexual."[9] On the facts of this case, we need not declare particular standards as to what sexual communications may be improper between children and their caretakers. It is enough that we determine that the sexually oriented communications at issue constitute abuse, within the reach of the regulation, if they are not reasonably intended to provide information and direction for the child's education and physical and emotional well-

---

[8]John D.'s reliance on the definition of "sexual contact" in G. L. c. 12, § 11L, is misplaced. That section proscribes specific acts of a sexual nature between unlicensed health care professionals and their patients. That definition is so embedded in the context of professional-patient relationships as to have no significance in the parent-child relationship at issue in the present case.

In a further attempt to show that contact must be physical in nature, John D. cites *Herridge* v. *Board of Registration in Med.*, 420 Mass. 154, 166 (1995), as distinguishing between "suggestive conversation" and "contact." The statement referred to is: "If the petitioner engaged a patient under his care in personal, sexually suggestive conversation leading to sexual contact that exploited the professional relationship, the board was entitled to conclude that he had violated ethical standards governing the practice of psychiatry." *Ibid.* We do not read *Herridge* as establishing a broad rule that physical contact is a necessary component of "sexual contact" in the context of a caretaker relationship.

[9]"Sexual" is defined as: "Of, relating to, involving, or characteristic of sex, sexuality, the sexes, or the sex organs and their functions," or as "[i]mplying or symbolizing erotic desires or activity." The American Heritage Dictionary 1654 (3d ed. 1992).

"Sexual" also is defined as "of or relating to the sphere of behavior associated with libidinal gratification." Webster's Third New International Dictionary 2082 (1993).

being.[10] Here, the hearing officer concluded that John D. was not acting "out of concern for [the stepdaughter's] physical well-being" when he discussed oral sexual acts and asked his stepdaughter whether he could examine her genital area to determine whether she was a virgin.[11] The administrative hearing officer appears not to have credited his explanations because she concluded he "offered so many different accounts of what occurred indicat[ing] that he is not being truthful." This determination was hers to make. See *Hotchkiss* v. *State Racing Commn.*, 45 Mass. App. Ct. 684, 698 (1998).

John D. argues that while some of his discussions with his stepdaughter may have been "inappropriate," they did not "rise to the level of sexual abuse within the definition set forth in [G. L.] c. 119, § 51A."[12] Two DSS supervisory staff members testified that "[t]here is almost no situation in which an adult male, a stepfather especially, father included, as far as this office is concerned, [in which it] would in any way be appropriate to look at the genitals or discuss the genitals" and that a "show and tell atmosphere" in sex education is "clearly not appropriate." This testimony, based on agency experience, constitutes the kind of evidence upon which the hearing officer could rely in concluding that John D. did not act out of concern for his stepdaughter's well-being. The administrative hearing officer noted that the DSS regulations "do not limit sexual

---

[10]Following the fair hearing, John D.'s motion in the Superior Court to submit additional evidence was allowed. That evidence is a report of his psychological evaluation, offered to show he tested "negative for pedophilia, voyeurism, frotteurism, or paraphilia." The Superior Court judge does not refer to the report in his decision. These clinical conclusions are of no effect in the present case. We note, however, the psychologist's conclusion that John D.'s "offer to examine [the stepdaughter's] genitals to see if her hymen was intact was poor parental judgment, even if done in the context of a ruse to provide information that a parent might reasonably want to know. Family acceptance of and participation in nudism would still require a respect for and reasonable observance of the basic sexual privacy of a young woman."

[11]John D. testified that he wanted to see the stepdaughter's hymen "because if it wasn't there or if I could not determine it [was] there easily, that I was going to talk to her mother and try my best to convince her to take her to the doctors and have her examined and possibly put her on protection."

[12]John D. does not otherwise argue that the DSS decision or the hearing procedures were not in conformity with applicable regulations. See *110 Code Mass. Regs.* § 10.05 (1994) & § 10.06(8)(c) (1994). See also *Edward E.* v. *Department of Social Servs.*, 42 Mass. App. Ct. 478, 479 (1997).

contact to physical touching."[13] She concluded that John D.'s "verbal sexual contact" constituted abuse within the meaning of the regulation.[14] "The court shall give due weight to the experience, technical competence, and specialized knowledge of the agency." G. L. c. 30A, § 14(7). *Evans* v. *Contributory Retirement Appeal Bd.*, 46 Mass. App. Ct. 229, 233 (1999), and cases cited.

Moreover, there was evidence of a risk of harm to the stepdaughter from these inappropriately sexually laden communications. The stepdaughter told the investigator that she didn't "feel comfortable" with John D.'s nude conduct[15] and his asking to see her hymen. She also stated that John D. thought he could say anything without offending her and that she felt he should move away. The evidence that John D.'s conduct was not only inappropriate but unwanted reasonably gives rise to an inference of a substantial risk of emotional injury to the stepdaughter. While there was no direct or expert evidence of emotional harm presented at the fair hearing, we do not think such proof was required to justify the conclusion that the kind of inappropriate and unwanted conduct and sexually explicit remarks and questions as occurred in this case constitute the type of abuse the regulation encompasses. Section 51A speaks of a "substantial risk of harm," and the definition of abuse in 110 Code Mass. Regs. § 2.00 (1996), includes "a substantial risk of . . . emotional injury."[16] The DSS need not wait until a risk is actuated before intervening. The statutes under which it

[13]The hearing officer's conclusion is reinforced by her distinguishing between improper conversation and conduct and permissible touching. She found an incident of touching the stepdaughter's chest to examine for a lump did not constitute sexual contact or a sexual offense.

[14]In so doing, the hearing officer implicitly concluded that John D., as the aggrieved party, did not meet his burden of demonstrating, by a preponderance of the evidence, the existence of administrative error. See 110 Code Mass. Regs. § 10.23 (1993).

[15]The stepdaughter's mother stated to the DSS investigator that her daughter was "uncomfortable" with the stepfather's nude conduct and "hated it" when he came to talk to her, often while he was nude and while she was in the bathtub.

[16]General Laws c. 119, § 51A, states that certain persons who "shall have reasonable cause to believe that a child . . . is suffering physical *or emotional injury* resulting from abuse . . . which causes harm or substantial risk of harm to the child's health or welfare including sexual abuse, or from neglect,

operates are "intended to apply to threatened harm to children as well as actual harm." Op. Atty. Gen., No. 59 at 139, 140-141 (May 27, 1975).

Accordingly, we agree with the Superior Court judge that John D.'s "engaging his stepdaughter in sexually explicit conversations and suggesting sexual contact with her, such as examining her genitals and [offering to help her with] romantic kissing, is thus consistent with the plain and ordinary meaning of the word contact." We further find support in the record for the judge's conclusion that this was conduct "potentially caus-ing emotional harm to a child" and, therefore, that such behavior reasonably is within the cognizance of the regulation. Beyond the considerable deference we accord to an agency's interpreta-tion of its own regulation, we conclude that the interpretation by DSS of its regulation in this case was rational, reasonable, and consistent with its plain terms. See *Warcewicz* v. *Depart-ment of Envtl. Protection,* 410 Mass. 548, 550-551 (1991), and cases cited. Moreover, we conclude the regulation has been ap-plied in a manner consistent with the purposes of c. 119, § 51A. See *Massachusetts Coalition for the Homeless* v. *Secretary of Health & Human Servs.,* 422 Mass. 214, 226-227 (1996).

Finally, John D. asserts that because the hearing officer stated there was no indication that the two children were injured physi-cally or emotionally by the domestic violence they witnessed, there is no evidence supporting the charge of neglect.[17] The hearing officer concluded that the physical and verbal conflict between John D. and his wife, witnessed by the children, and acknowledged by John D., "constitutes a failure to provide the children with minimally adequate stability and growth."[18] There was evidence, as related by the investigator, that the stepdaughter was upset by the frequent fighting of the parents over her and

---

. . . shall immediately report such condition to the department." (Emphasis added.) The language, "which causes harm or substantial risk of harm," was inserted by St. 1993, c. 50, § 23.

[17]Neglect is defined at 110 Code Mass. Regs. § 2.00 (1996) as, "failure *by a caretaker,* either deliberately or through negligence or inability, to take those actions necessary to provide a child with minimally adequate food, clothing, shelter, medical care, supervision, emotional stability and growth, or other essential care." (Emphasis original.)

[18]The record indicates that the wife had been arrested and charged criminally after one confrontation and that a court ordered therapy for the couple.

that the younger child told the investigator that her parents fought. "It is well documented that witnessing domestic violence . . . has a profound impact on children." *Custody of Vaughn*, 422 Mass. 590, 599 (1996), and authorities cited. The associated risk of psychological problems in children who witness domestic violence justifies the hearing officer's conclusion that John D., albeit in conjunction with the mother, failed to provide minimal emotional stability to the children and that such a failure constituted neglect under the regulation. In the circumstances, this conclusion also reinforces the finding of abuse because John D.'s conduct contributed to the creation of a substantial risk of emotional injury.

John D. urges, on due process grounds, that we consider imposing a heightened evidentiary standard, such as that of clear and convincing evidence, so as to provide greater protection against a person improperly being designated as a perpetrator of sexual abuse because of the "powerful stigma" attached to the designation. He raises no issue concerning the adequacy of the G. L. c. 30A proceeding, or of any specific evidence, nor does he indicate whether or how the result here might be different under another standard. In these circumstances, we have no reason to consider a departure from the G. L. c. 30A process and standards recently confirmed in *Edward E.* v. *Department of Social Servs.*, 42 Mass. App. Ct. 478, 479-481 (1997). Moreover, while the decision to place a name on the registry of alleged perpetrators is a decision "of more than ordinary gravity in that it places a permanent mark on a person," *id.* at 487, that decision should not result in widespread stigmatization because access to the registry may only be obtained by written authorization of the DSS commissioner.[19] Compare *Doe, Sex Offender Registry Bd. No. 972* v. *Sex Offender Registry Bd.*, 428 Mass. 90, 102 (1998) ("stigma of being required to register as a

---

[19]Pursuant to 110 Code Mass. Regs. § 4.38 (1996), access is limited to: "(1) The Commissioner, or his/her specifically named designee . . . for the purpose of screening: (1) applicants for employment . . . , by the Department in a position with direct contact with clients or children; (2) applicants to become foster parents; and, (3) applicants to become adoptive parents.

. . .

"(4) No other individual, group, agency or department, including law enforcement, child welfare or educational agencies, may have access to the

sex offender and of having information regarding sex offenses disseminated to the public, [not] sufficient to require a higher standard of proof than that generally required in civil proceedings").

*Judgment affirmed.*

Registry of Alleged Perpetrators without the written approval of the Commissioner, or an order of a court of competent jurisdiction."